UNITED STATES DISTRICT COURT
THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| Luis Eduardo PEREZ PARRA, *et al.*,<br><br>*Petitioners*,<br><br>v.<br><br>DORA CASTRO, *et al.*,<br><br>*Respondents.* | No. 1:24-cv-00912-KG-KRS |

**PETITIONERS' OPPOSED MOTION FOR A TEMPORARY RESTRAINING ORDER ENJOINING PETITIONERS' TRANSFER FROM THIS JUDICIAL DISTRICT**[1]

As of today, the United States government has undertaken five military flights transferring over 50 individuals in immigration detention inside the mainland United States, to the U.S. Naval Base at Guantánamo Bay ("Guantánamo"). Petitioners, Luis Eduardo Perez Parra, Leonel Jose Rivas Gonzalez, and Abrahan Josue Barrios Morales ("Petitioners"), hereby submit this motion for a temporary restraining order enjoining their transfer to Guantánamo based on the risk that such a transfer may be imminent. Petitioners, Venezuelan nationals in Immigration and Customs Enforcement ("ICE") detention in El Paso, fit precisely the profile of the individuals who have already been transferred to Guantánamo and have information indicating that they will be likewise transferred. Petitioners respectfully urge this Court to exercise its equitable authority under the All Writs Act, 28 U.S.C. § 1651(a) to "issue all writs necessary or appropriate in aid of their respective jurisdiction," and immediately issue an order enjoining the transfer of Petitioners to Guantánamo,

---

[1] Counsel for Respondents has informed Petitioners' counsel that Respondents oppose this motion.

so as to maintain the status quo, ensure the government does not attempt to reject this Court's continuing jurisdiction, and ensure full counsel access connected to Petitioners' pending habeas proceedings before this Court.

The relief requested is modest. While firmly established law mandates that this Court should retain jurisdiction over their pending habeas petitions even upon transfer to the U.S. controlled territory in Guantánamo, it is entirely uncertain that the Trump administration will adhere to that legal principle and entirely certain that counsel access will be materially and prejudicially diminished upon transfer to Guantánamo's offshore detention facilities. Critically, however, this Court need not actually decide the legal status of immigration detentions in Guantánamo or prescribe conditions for counsel access there; the mere uncertainty the government has created surrounding the availability of legal process and counsel access is sufficient to authorize the modest injunction requested under the prophylactic equitable powers the All Writs Act confers to this Court to preserve the status quo and protect the integrity of ongoing judicial proceedings.

**I.    BACKGROUND**

    **A.    President Trump's Executive Order and Corresponding Transfers of Venezuelan Migrants from El Paso to Military Barracks at Guantánamo**

On January 29, 2025, President Donald Trump issued a memorandum directing the Secretary of Homeland Security and Secretary of Defense "to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo [sic] Bay to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United

States."[2] Recent reports confirm that the U.S. government has diverted hundreds of troops to Guantánamo to start setting up a tent city for noncitizens, pursuant to President Trump's orders.[3]

Since February 4, 2025, the U.S. government has transferred over 50 noncitizens to Guantánamo, without providing any information about their circumstances or the government's legal authority for these unprecedented actions. The government has provided virtually no information about these individuals, including how long they will be held at Guantánamo, under what authority and conditions, subject to what legal processes, or whether they will have any means of communicating with their families and attorneys. Indeed, lawyers in the Trump administration were reportedly still reviewing the legality of sending immigrants to Guantánamo from immigration detention facilities inside the United States when the first plane departed.[4]

As of the date of this filing, the U.S. government has flown five sets of immigration detainees to Guantánamo—on February 4, 6, 7, 8, and 9. All of these military planes have departed from the Fort Bliss Army base near El Paso, Texas. On February 8, a fourth group arrived to Guantánamo "in what has become an emerging U.S. military air bridge from an immigration site in El Paso."[5] Government officials have consistently stated that the administration is prioritizing for transfers to Guantánamo, Venezuelan men with alleged ties to the Tren de Aragua gang[6]—an

---

[2]    The White House, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity" (Jan. 29, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/.

[3]    Carol Rosenberg & Eric Schmitt, *Guantánamo Bay Prepares for President Trump's Migrant Surge*, N.Y. TIMES (Feb. 3, 2025), https://www.nytimes.com/2025/02/03/us/politics/guantanamo- trump-migrants.html.

[4]    Priscilla Alvarez, *et al.*, *Migrant flight lands in Guantanamo Bay as legal questions swirl around Trump plans*, CNN (Feb. 4, 2025), https://www.cnn.com/2025/02/04/politics/guantanamo-migrant-flight/index.html.

[5]    Carol Rosenberg, *A Tent City is Rising at Guantanamo Bay*, N.Y. TIMES (Feb. 8, 2025), https://www.nytimes.com/2025/02/08/us/politics/guantanamo-bay-migrants.html.

[6]    *Id.*

incorrect allegation made against two Petitioners over their strenuous objection. *See* Ex. 3, Declaration of Leonel Jose Rivas Gonzalez ("Gonzalez Decl.") at ¶ 4 ("I am not a gang member, and the only reason they accuse me of being a gang member is because I have tattoos, but the tattoos are not related to any gang."). As detailed below, when Petitioners saw the news coverage of the first of these Guantánamo flights,[7] Petitioners personally recognized several of those detainees as having been detained at the Otero County Processing Center in Chaparral, New Mexico—where Petitioners are currently detained. *See* Ex. 1, Declaration of Abrahan Josue Barrios Morales ("Morales Decl.") at ¶ 4; Ex. 2, Declaration of Luis Eduardo Perez Parra ("Parra Decl.") at ¶ 4; Ex. 3, Gonzalez Decl. at ¶ 10.

These transferees are reportedly being detained *not* in the civilian Migrant Operations Center at Guantánamo that has historically been used to detain migrants interdicted at high sea. Instead, they are detained at the same prison designed to house law-of-war detainees apprehended in post 9/11 operations, raising significant and concerning questions about the government's plans for these and other migrants it intends to detain at Guantánamo as well as the legal status the administration will seek to confer upon them.[8] The administration has announced that it is planning to send tens of thousands of additional immigration detainees to Guantánamo in the near future. In fact, the government is reportedly moving rapidly to arrange for *daily* flights transferring immigration detainees to Guantánamo.[9]

---

[7] *See, e.g.*, @CBP, X (Feb. 4, 2025, 5:35 PM), https://x.com/CBP/status/1886936769242845237.

[8] Hamed Aleaziz, *et al.*, *U.S. Is Holding Migrants in Cells That Once Held Al Qaeda Suspects*, N.Y. TIMES (Feb. 5, 2025), https://www.nytimes.com/2025/02/05/us/politics/migrants-trump-guantanamo-prison.html.

[9] Camilo Montoya-Galvez & Eleanor Watson, *Trump Officials Eye Daily Migrant Detainee Flights to Guantanamo Bay*, CBS NEWS (Feb. 6, 2025), https://www.cbsnews.com/news/trump-officials-eye-daily-migrant-detainee-flights-to-guantanamo-bay/.

Following a meet and confer on this motion, counsel for the government stated that the none of Petitioners "are being moved to Guantanamo." While speaking narrowly in the present tense, the government provides no assurance they would not be moved in the near future. And notably, the government opposes the modest relief requested by this motion. Clearly, the relief requested would do no harm to the government if there is no planned transfer while it would protect the interests of Petitioners and this Court.

     **B.**     **The Legal Uncertainties Surrounding Current and Future Detentions at Guantánamo.**

U.S. detention practices in Guantánamo have consistently violated basic human rights and domestic constitutional norms. From the detention of thousands of Haitian refugees fleeing persecution in 1991, to the detention of Muslim men and boys apprehended in the "Global War on Terror," Guantánamo has been a site of lawlessness and torture, which surfaces troubling questions about why this administration seeks to use this notorious and remote offshore detention facility to house thousands of immigrants who are in removal proceedings or in detention pending removal. In the years following the September 11 attacks, Guantánamo predominantly functioned as a central hub for a U.S. policy contemplating the indefinite, secret detention of suspected terrorists.[10] The executive branch's goal was to create a "legal black hole," or "the legal equivalent of outer space"—explicitly outside the jurisdiction of U.S. courts.[11] Accordingly, the George W. Bush

---

[10]    JOSEPH MARGULIES, GUANTÁNAMO AND THE ABUSE OF PRESIDENTIAL POWER (2007).
[11]    Michael Isikoff, *The Gitmo Fallout*, NEWSWEEK (July 16, 2006, 8:00 PM), https://www.newsweek.com/; *see also* Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from Patrick F. Philbin & John C. Yoo, Deputy Assistant Attorneys General, Office of Legal Counsel (Dec. 28, 2001), *reprinted in* THE TORTURE PAPERS: THE ROAD TO ABU GHRAIB, 29—37 (Karen J. Greenberg & Joshua L. Dratel, eds. 2005) (stating government's belief that a federal district court cannot properly exercise *habeas corpus* jurisdiction over detainees on Guantánamo because the U.S. does not have sovereignty over the island under its lease with Cuba).

administration undertook to detain individuals incommunicado—including without any counsel access—and subject them to abusive treatment and conditions amounting to torture.[12]

As one human rights expert observed, "Trump is only the most recent president to seek to use Guantánamo as a legal black hole to try to get away with impermissible treatment."[13] Indeed, this administration's fidelity to law has been under serious question as courts have enjoined numerous of its recently issued executive orders as ultra vires and unlawful.[14] Thus, in taking the extraordinary and unnecessary effort to transfer immigration detainees to Guantánamo, the administration is quite likely using this notorious prison—and its reputation for lawlessness and maltreatment—for its *in terrorem* effect on current and future immigrants.

The Constitution, along with federal and international law, have since developed to prohibit the government from using Guantánamo as a legal black hole.[15] In addition, the current law in this Circuit ensures that transfers of petitioners with pending habeas petitions of the kind these

---

[12] The Center for Constitutional Rights, *Report on Torture and Cruel, Inhuman, and Degrading Treatment of Prisoners at Guantanamo Bay, Cuba* (July 2006), https://ccrjustice.org/files/Report_ReportOnTorture.pdf; Jane Mayer, *The Experiment*, New Yorker, July 11, 2005, at 63; Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y. TIMES (Nov. 30, 2004), at A1.

[13] Silvia Foster Frau, *Why lawyers worry migrants sent to Gitmo are entering a 'legal black hole'*, WASH. POST (Feb. 8, 2025), https://www.washingtonpost.com/immigration/2025/02/08/guantanamo-migrants-trump-deportations-noem/.

[14] *See, e.g.*, *State v. Trump*, No. C25-0127-JCC, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025) (enjoining enforcement of President Trump's Executive Order providing that birthright citizenship did not extend to children of undocumented immigrants); *Doe v. McHenry*, C25-0286-RCL, 2025 WL 388218 (D.D.C. Feb. 4, 2025) (enjoining enforcement of President Trump's Executive Order to move incarcerated transgender women into men's facilities and stop gender transition medical treatments).

[15] *See Rasul v. Bush*, 542 U.S. 466 (2004) (recognizing that the habeas statute applies to executive detentions in Guantánamo); *Boumediene v. Bush*, 553 U.S. 723, 771, 779 (2008) (recognizing that constitutional rights extend to detainees held at Guantánamo and ensuring "meaningful" judicial review of habeas petitions); *see also Odah v United States*, 346 F. Supp. 2d 1 (D.D.C. 2004) (ensuring that Guantánamo detainees retained full access to counsel and that attorney-client privilege could not be abrogated by government's proposed security measures).

Petitioners have, cannot defeat the original court's jurisdiction over those petitions.[16] But given Guantánamo's shameful history as a prison-outside-the-law, and the aggressive pace of unprecedented transfers of immigration detainees to Guantánamo in recent days, undersigned counsel are gravely concerned that if Petitioners are transferred to Guantánamo, their substantive and procedural rights will not be fully respected by this administration.[17]

Thus, concerns remain that the agencies responsible for implementing the January 29, 2025 Guantánamo Executive Order: (1) will not faithfully comply with legal requirements governing the detention of Petitioners there or accept this Court's continuing jurisdiction, (2) will not grant full access to counsel to meet with Petitioners, and certainly not on terms currently available to Petitioners' immigration counsel in New Mexico, nor allow Petitioners to communicate with loved ones; and (3) will subject Petitioners to prolonged or indefinite detention at Guantánamo and will not make adequate provisions to ensure the safety and health of Petitioners there. Public reporting

---

[16] *Pinson v. Berkebile*, 604 F. App'x 649, 652–53 (10th Cir. 2015) (holding that a prisoner's transfer from one federal facility to another during the pendency of a habeas corpus proceeding does not defeat the original district court's jurisdiction); *see also In re Hall*, 988 F.3d 376, 378 (7th Cir. 2021) (same).

[17] President Trump's prior statements seeking to underscore unlawful features of Guantánamo heighten these concerns. In 2016, President Trump claimed during his candidacy that he would keep Guantánamo open and "load it up with some bad dudes." *See* David Welna, *Trump Has Vowed To Fill Guantanamo With 'Some Bad Dudes' — But Who?*, NPR (Nov. 14, 2016), https://www.npr.org/sections/parallels/2016/11/14/502007304/trump-has-vowed-to-fill-guantanamo-with-some-bad-dudes-but-who. He advocated that American citizens be tried by Guantánamo military commissions in direct contravention of federal law. Patricia Mazzei, *Trump: Americans could be tried in Guantánamo*, MIAMI HERALD (Aug. 11, 2016), http://www.miamiherald.com/news/politics-government/election/donald-trump/article95144337.html. Shortly before his first inauguration, President Trump expanded on his position regarding the prison, declaring in response to the Obama administration's transfer of detainees cleared for release that "[t]here should be no further releases from Gitmo." *See* @realDonaldTrump, X (Jan. 3, 2017, 10:20 PM), https://x.com/realdonaldtrump/status/816333480409833472.

suggests the administration's lawyers themselves have not fully considered these critical questions.[18]

As described below, uncertainty about these questions alone is enough of a basis to grant the modest relief requested to maintain the status quo and aid in preserving this Court's jurisdiction to resolve the habeas petitions pending before it.

### C. The Serious, Comparative Limitations on Counsel Access in Guantánamo

Counsel's current access to Petitioners is robust and quick. Counsel is currently able to easily arrange private client meetings by video, phone, or in-person. Counsel has typically been able to schedule these meetings with less than 24-hours' notice by emailing guards at the facility who are in charge of ensuring legal access. Indeed, Counsel has met with at least one of the Petitioners virtually or in-person several times over the past few days.

In obvious contrast, counsel access has enormous practical limitations in Guantánamo. Undersigned counsel, the Center for Constitutional Rights, filed the first habeas petitions challenging the Bush administration's military detentions in 2002, and has represented dozens of Guantánamo detainees in the twenty years since its victory in the Supreme Court case, *Rasul v. Bush*, 542 U.S. 466 (2004), and its lawyers have collectively made hundreds of visits to the Base. Counsel is thus well positioned to state the obvious, which is that counsel access to clients detained in Guantánamo is limited by legal and practical considerations that would implicate the continued representation of Petitioners. Indeed, that is likely the very outcome the administration is seeking by moving immigration detainees to a remote island prison a thousand miles away from their attorneys.

---

[18]  Priscilla Alvarez, *et al.*, *Migrant flight lands in Guantanamo Bay as legal questions swirl around Trump plans*, CNN (Feb. 4, 2025), https://www.cnn.com/2025/02/04/politics/guantanamo-migrant-flight/index.html.

While the courts have authorized basic access to visit military detainees at Guantánamo, those military counsel nevertheless face serious legal and practical obstacles in accessing and communicating with clients. For example, the government has required counsel to undertake a lengthy security clearance process in order to communicate with detainees and to enter the Guantánamo theater. Such a requirement is driven by the presumptively classified nature of communications from military detainees and thus would be wholly inappropriate here. Still, it is unclear whether the administration would nevertheless insist on such procedures for a period of time—and until the courts deem them invalid. In addition, there are no commercial flights to Guantánamo, so visits to clients can happen only via military charters flying exclusively on a weekly basis from D.C. and only with the advanced planning and permission from the Defense Department. And, travel to Guantánamo and back each takes at least a full day.

Moreover, client calls and communications are severely limited and restricted. For example, counsel from the Center for Constitutional Rights can represent that telephone access at Guantánamo detention facilities (including the one in which current immigration detainees are being held) is so limited that they must be reserved 15 days in advance. The very remoteness of this island prison will put counsel visits in the foreseeable future in obvious jeopardy. It is also reasonable to assume, based on public reporting and the absence of any assurance otherwise from the administration, that the administration has not made arrangements for fluid and regular counsel access to clients via telephone, tablet, or videoconferencing, which would only be further compromised by the planned detention of thousands of persons. Transfers to Guantánamo, therefore, will surely limit and deteriorate the access to counsel Petitioners currently enjoy, and which is necessary for counsel's ethical representation of Petitioners' interests.

### D. Petitioners' Pending Legal Proceedings Before This Court

Petitioners filed their Petition for Writ of Habeas Corpus on September 13, 2024. *See* ECF No. 1. Petitioners challenge the legality of their continued detention by ICE as violative of the Immigration and Nationality Act and the Due Process Clause of the Fifth Amendment of the U.S. Constitution. *See id.* Petitioners subsequently filed a Motion for an Order to Show Cause on October 1, 2024. *See* ECF No. 10. The Court issued an Order to Show Cause on November 26, 2024, *see* ECF No. 29, the parties briefed their positions, and the Court heard argument on January 15, 2025. ECF No. 40. The Court has set a deadline of February 24, 2025, for the parties to submit additional briefing and status updates to the Court, and the Court has scheduled a status conference for March 3, 2025. ECF No. 41.

### E. The Substantial Risk that Petitioners Will Be Transferred to Guantánamo

Petitioners have good reason to fear transfer to Guantánamo. As detailed in the attached declarations, some Petitioners have reason to believe they are on a list of Venezuelans slated for transfer, *see* Ex.1, Morales Decl. ¶ 5; other Petitioners were grouped with other Venezuelans to provide personal information to ICE officials in an unusual manner that reasonably suggests an imminent transfer, *see* Ex. 4, Declaration of Diana Nevarez Ramirez ("Nevarez Decl.") at ¶ 4; Ex. 3, Gonzalez Decl. at ¶ 11; Ex. 2, Perez Parra Decl. at ¶ 7; others report that ICE has specifically informed Venezuelan detainees that they would be sent to Guantánamo, *see* Ex. 2, Perez Parra Decl. at ¶ 6; and Petitioners have recognized some of the individuals who were already transferred to Guantánamo as individuals who had earlier been in detention with them in Otero. *See* Ex. 1, Morales Decl. at ¶ 4; Ex. 2, Perez Parra Decl. at ¶¶ 4-7; Ex. 3, Gonzalez Decl. at ¶ 10.

Petitioners are well aware that their identity and characteristics puts them at particularly heightened risk of imminent transfer to Guantánamo. Petitioners are Venezuelan men, two of

10

whom are alleged by the U.S. government to be members of the Tren de Aragua gang (which, as earlier briefed, Petitioners vehemently deny), detained by ICE proximate to the Fort Bliss military base from which Guantánamo flights are departing (in what the nation's leading Guantánamo reporter calls "an emerging U.S. military air bridge from an immigration site in El Paso"[19]). Petitioners understand from the events of the past week and statements made by senior government officials that ICE is highly motivated to undertake additional Guantánamo transfers at a rapid pace.

Petitioners acutely fear for their own safety and wellbeing, given this risk of imminent transfer. *See* Ex. 3, Gonzalez Decl. at ¶¶ 4-7 (detailing fear and trauma about detention and prospect of transfer to Guantánamo, including instances of self-harm requiring medical and mental health attention); Ex. 2, Perez Parra Decl. at ¶¶ 4-5 (detailing observations leading to fear of imminent transfer); Nevarez Decl. ¶ 4.

Further, ICE has been evasive, obstructionist, and nonresponsive to Petitioners' counsel regarding Petitioners and other individuals detained in the El Paso area at risk of imminent transfer to Guantánamo. *See* Ex. 5, Declaration of Jorge Dominguez ("Dominguez Decl.") at ¶¶ 4-5. On February 7, 2025, counsel for Petitioners contacted ICE by email requesting assurance that Petitioners will not be transferred to Guantánamo. *See* Ex. 6, Declaration of Zoe Bowman at ¶ 7. ICE has not responded. *Id.* In addition, counsel for Petitioners attempted to learn whether a different client was being transferred to Guantánamo, and ICE appeared to cancel the transfer of that client to Guantánamo after counsel called ICE to inquire about the transfer. *Id.* at ¶ 4. Other attorneys have also attempted to reach Venezuelans in ICE custody they believe were transferred to Guantánamo. ICE did not admit to them being in Guantánamo, and instead gave conflicting answers about their locations, and did not allow the attorneys to speak with them. Anwen Hughs,

---

[19]   *See supra* note 5.

the Director of Legal Strategy for Refugee Programs at Human Rights First, learned from an ICE supervisor that seven detained Venezuelan men had been transferred to Miami even though six of the men are still listed in the ICE detainee locator as being held at the El Paso Service Processing Center and the seventh man is still listed as being in ICE custody with no location. *See* Ex. 7, Declaration of Anwen Hughs at ¶¶ 2, 9-10. These are some of the same detained Venezuelan men Mr. Dominguez tried to visit at the El Paso Service Processing Center and was informed by ICE that they simply were not available for a visit. *See* Ex. 5, Dominguez Decl. at ¶ 4.

For these reasons, Petitioners' counsel is alarmed at the prospect that Petitioners may be imminently transferred to Guantánamo with no notice to Petitioners' counsel and no opportunity to challenge the transfer.

## II.     ARGUMENT

There is a well-substantiated risk that Petitioners will be transferred to detention facilities at Guantánamo. Any such transfer would demonstrably compromise Petitioners' access to counsel and may, depending upon the government's as-yet-unstated legal position, implicate this Court's jurisdiction. At best, the government is, intentionally or not, erecting unnecessary barriers to counsel access and the adjudication of pending habeas petitions; at worst, it is attempting to transfer individuals to this notorious offshore prison in order to cut off legal process altogether. In our system of separation of powers, the executive branch cannot "switch the Constitution on and off at will," *see Boumediene v. Bush*, 553 U.S. 723, 765 (2008); the executive must adhere to an orderly legal process as directed by this Court. Accordingly, this Court should guard against any attempt to move Petitioners out of this judicial district and thereby create delay or uncertainty about this Court's ability to meaningfully and timely adjudicate their pending habeas petitions or otherwise diminish Petitioners' access to counsel.

The Court has ample power conferred to it by the All Writs Act, as well as under the court's inherent equitable power, to issue a modest injunction preventing any transfer of Petitioners to ensure that their pending legal claims are fully adjudicated before this Court. In issuing the injunction, the Court need not evaluate questions regarding the legality of immigration detention in Guantánamo or the likelihood of success of Petitioner's substantive claims for relief in habeas. Instead, the Court can issue such a modest injunction to avoid any uncertainty that might arise in case of a transfer and to ensure the integrity and availability of ongoing judicial proceedings, without reviewing the government's claimed authority to transfer or the merits of Petitioners' underlying habeas claims. And, by simply preserving the status quo, such an order will impose no burden on the government.

### A. Under the All Writs Act and this Court's Inherent Authority, this Court Retains Broad Power to Prevent Transfers that Implicate the Integrity of Court Proceedings.

The All Writs Act ("AWA") provides federal courts with a powerful tool to preserve the integrity of their jurisdiction to adjudicate claims before them. *See* 28 U.S.C. § 1651(a) (authorizing federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"); *TBG v. Bendis*, 36 F.3d 916, 925 (10th Cir. 1994). The Act encompasses a federal court's power to "maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels," *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966), and courts have found that the Act should be broadly construed to "achieve all rational ends of law," *California v. M&P Investments*, 46 F. App'x 876, 878 (9th Cir. 2002) (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)).[20]

---

[20] Although the AWA does not appear in many Tenth Circuit cases, its principles are well established by the U.S. Supreme Court, *see, e.g.*, *United States v. N.Y. Tel. Co.*, 434 U.S. 159

Whereas a traditional preliminary injunction requires a party to state a claim, an injunction based on the AWA requires only that a party identify a threat to the integrity of an ongoing or prospective proceeding, or of a past order or judgment. *Klay*, 376 F.3d at 1097 (a court may enjoin almost any conduct "which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion"). Thus, to issue an injunction pursuant to the AWA, this Court need not find that there is a likelihood of success on the merits of the underlying claims. *See Wagner v. Taylor*, 836 F.2d 566, 571–72 (D.C. Cir. 1987) (showing of irreparable injury suffices); *Arctic Zero, Inc. v. Aspen Hills, Inc.*, No. 17-CV-00459-AJB-JMA, 2018 WL 2018115, at *5 (S.D. Cal. May 1, 2018) (distinguishing AWA injunction from traditional preliminary injunction). Rather, it is sufficient for the Court to find that a party has identified a threat to the integrity of or "natural conclusion" of an ongoing proceeding such as the instant habeas action.

Courts have explicitly relied upon the AWA to enjoin proceedings commenced after the court's assertion of jurisdiction in order to prevent even a risk that a respondent's actions will diminish the court's capacity to adjudicate claims before it. *See Kurnaz v. Bush*, No. 04-cv-1135, 2005 WL 839542, *1–2 (D.D.C. Apr. 12, 2005) (enjoining Defense Department from transferring Guantánamo detainee with pending habeas petition, absent notice, outside the jurisdiction of the court); *Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) (using the AWA to stay an order of deportation "in order to safeguard the court's appellate jurisdiction" and preserve its ability to hear subsequent appeals by the petitioner). At a minimum, the AWA authorizes the Court to ensure that the to-be-transferred detainees are not put in a worse legal position by virtue of their transfer. *See*

---

(1977), and in sister circuits, *see, e.g.*, *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092 (11th Cir. 2004).

*Al Otro Lado v. McAleenan*, 423 F. Supp. 3d 848, 874–78 (S.D. Cal. 2019) (enjoining application of Trump administration "transit ban" which would categorically bar consideration of class members' asylum claims who would only be subject to that categorical ban because of the alleged unlawful delays created by the government and subject to adjudication before the court); *N.Y. Tel. Co.*, 434 U.S. at 173 (holding that AWA allows a federal court to "avail itself of all auxiliary writs as aids in the performance of its duties, when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it").

Courts also retain their inherent equitable authority to enjoin transfers pending a habeas petition, and courts regularly exercise that authority. *See, e.g.*, Order, *Westley v. Harper*, No. 2:25-cv-00229 (E.D. La. Feb. 2, 2025), ECF No. 7; *Santos Garcia v. Wolf*, No. 1:20-cv-821 (LMB/JFA), 2020 WL 4668189 (E.D. Va. Aug. 11, 2020); Order, *Campbell v. U.S. Immigr. & Customs Enf't*, No. 1:20-cv-22999-MGC (S.D. Fl. July 26, 2020), ECF No. 13; Order, *Sillah v. Barr*, No. 19-cv-1747 (S.D.N.Y. Feb. 25, 2019), ECF No. 3; *see also Zepeda Rivas v. Davis*, 504 F. Supp. 3d 1060, 1077 (N.D. Cal. 2020); *Dorce v. Wolf*, No. 20-CV-11306, 2020 WL 7264869 (D. Mass. Dec. 10, 2020). *See also* 28 U.S.C. § 2243 (habeas courts authorized to order relief "as law and justice require").

Thus, under the AWA and the court's inherent power, this Court has authority to issue a modest injunction preventing Petitioners' transfer to Guantánamo, thereby protecting the integrity of this Court's jurisdiction, Petitioners' corresponding need to access counsel, and this Court's ability to fully adjudicate Petitioners' pending habeas proceedings.

    **B.**    **This Court Should Exercise Its Equitable Power Under the AWA to Enjoin the Transfer of Petitioners to Guantánamo**

Petitioners have shown a risk that Petitioners will be transferred outside this judicial district and to Guantánamo's offshore detention facilities and that, therefore, such a transfer implicates the

integrity of this Court's jurisdiction over pending habeas petitions as well as Petitioners' access to counsel necessary to adjudicate their petitions. First, there is a substantial risk that Petitioners will be transferred to Guantánamo. As of the date of this filing, reportedly four flights of immigration detainees have landed in Guantánamo, and the U.S. government is moving rapidly to arrange daily flights and effectuate its plan of sending thousands of additional immigration detainees to Guantánamo. Petitioners fit the profile of those the administration has prioritized for detention in Guantánamo, *i.e.* Venezuelan men detained in the El Paso area with (false) charges of connections with the Tren de Aragua gang. *See supra* Section I.A. Petitioners and their counsel have observed unusual ICE practices suggesting the possibility of an imminent transfer, and have heard of direct threats of imminent transfers. *See supra* Section I.E.

Second, the legal uncertainties surrounding these transfers threaten to disrupt or diminish the Court's capacity to exercise jurisdiction over pending habeas petitions. It is unclear why the Trump administration would seek to disrupt the domestic detention processes every prior administration has followed, to race to build and populate a vast detention operation for immigrants in Guantánamo. Guantánamo's historical functioning as an island prison beyond the operation of law, and the administration's failure to address obvious questions about the legal status of detentions in Guantánamo, raises plausible concerns that the administration will use this offshore prison to claim, *unlawfully*, that immigrants detained there have no rights or diminished rights. The Court doesn't have to decide that question and indeed, the best way to avoid that question is to enjoin transfer and maintain the status quo.

Finally and most obviously, is the risk to Petitioners' current full access to counsel which, based on public reporting and in the absence of any assurances from the administration, is bound to deteriorate. Current obstacles already facing Guantánamo military counsel include: a lengthy

16

security clearance process; the lack of commercial flights to Guantánamo and the difficulty of arranging travel via military charters (which operate weekly and require two full days of travel); and the severe limitations on client calls and telephone facilities, which generally must be reserved 15 days in advance. Although certain limitations may not apply with equal force to these proposed immigration detainees, counsel access will certainly be diminished given the inherent difficulty of communicating with clients on a remote island prison.

## CONCLUSION

Based on the foregoing, Petitioners respectfully urge this Court to exercise its authority under the All Writs Act, 28 U.S.C. § 1651(a), and immediately issue an order enjoining the transfer of Petitioners to the U.S. Naval Base at Guantánamo Bay. If argument would be helpful to the Court, Petitioners respectfully request that the Court set this Motion for argument via videoconferencing today or at the earliest possible date.

Dated: February 9   , 2025                                          Respectfully submitted,

/s/ Jessica Myers Vosburgh,

Jessica Myers Vosburgh*
Center for Constitutional Rights
P.O. Box 486
Birmingham, AL 35201
(212) 614-6492
jvosburgh@ccrjustice.org

Baher Azmy**
Samah Sisay*
Ayla Kadah**
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6436
bazmy@ccrjustice.org
ssisay@ccrjustice.org
akadah@ccrjustice.org

17

Rebecca Sheff
Max Brooks
ACLU of New Mexico
P.O. Box 566
Albuquerque, NM 87103
(781) 718-0990
rsheff@aclu-nm.org
mbrooks@aclu-nm.org

Zoe Bowman
Las Americas Immigrant Adv. Center
1500 Yandell Dr.
El Paso, TX 79902
(915) 433-9702
zoebowman@las-americas.org

*Appearing *pro hac vice*
** *Pro hac vice* forthcoming

**COUNSEL FOR PETITIONERS**

**CERTIFICATE OF SERVICE**

I hereby certify that, this 9th day of February, 2025, I filed a copy of the foregoing Motion for a Temporary Restraining Order electronically through the CM/ECF system, which gave service to all counsel of record.

s/ Rebecca Sheff
Rebecca Sheff
